INTERNATIONAL UNION, U. A. W. A., A. F. OF L.,
LOCAL 232, ET AL. v. WISCONSIN EMPLOYMENT
RELATIONS BOARD ET AL.

Nos. 14 and 15.   Argued November 17–18, 1948.—Decided February
28, 1949.

*David Previant* argued the cause and filed a brief for petitioners.

*Beatrice Lampert,* Assistant Attorney General of Wisconsin, argued the cause for the Wisconsin Employment

Relations Board, respondent. With her on the brief were *Grover L. Broadfoot,* Attorney General, and *Stewart G. Honeck,* Deputy Attorney General.

*Jackson M. Bruce* argued the cause for the Briggs & Stratton Corp., respondent. With him on the brief were *Edgar L. Wood* and *Bernard V. Brady.*

*Max Raskin* filed a brief for the Wisconsin State Industrial Union Council, as *amicus curiae,* in support of petitioners.

Briefs urging affirmance were filed as *amici curiae* by the following: A joint brief by *Guy E. Williams,* Attorney General, for the State of Arkansas, *J. Tom Watson,* Attorney General, for the State of Florida, *Robert L. Larson,* Attorney General, for the State of Iowa, *Eugene F. Black,* Attorney General, and *Edmund E. Shepherd,* Solicitor General, for the State of Michigan, *Walter R. Johnson,* Attorney General, for the State of Nebraska, *P. O. Sathre,* Attorney General, for the State of North Dakota, *Roy H. Beeler,* Attorney General, for the State of Tennessee, and *Grover A. Giles,* Attorney General, for the State of Utah; by *T. McKeen Chidsey,* Attorney General, *M. Louise Rutherford,* Deputy Attorney General, and *George L. Reed,* Solicitor, State Labor Relations Board, for the State of Pennsylvania; by *Leon B. Lamfrom* for the Employers Association of Milwaukee; and by *Howard Johnson* for the Wisconsin Manufacturers' Association et al.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Certain labor legislation of the State of Wisconsin,[1] as applied by its Supreme Court, is challenged because it is said to transgress constitutional limitations imposed

---

[1] The Wisconsin Employment Peace Act provides in part as follows:

"It shall be an unfair labor practice for an employe individually or in concert with others: (a) To coerce or intimidate an employe

248

by the Thirteenth and Fourteenth Amendments and by the Commerce Clause [2] as implemented by the National Labor Relations Act [3] and the Labor Management Relations Act of 1947.[4]

The Supreme Court of Wisconsin held [5] that its Act authorizes the State Employment Relations Board to order a labor union to cease and desist from instigating certain intermittent and unannounced work stoppages which it had caused under the following circumstances: Briggs & Stratton Corporation operates two manufacturing plants in the State of Wisconsin engaging approximately 2,000 employees. These are represented by the International Union, Automobile Workers of America, A. F. of L., Local No. 232, as collective bargaining agent, it having been duly certified as such by the National Labor Relations Board in proceedings under the National Labor Relations Act. Under such certification, the Union had

in the enjoyment of his legal rights, including those guaranteed in section 111.04, or to intimidate his family, picket his domicile, or injure the person or property of such employe or his family. . . . (e) To co-operate in engaging in, promoting or inducing picketing (not constituting an exercise of constitutionally guaranteed free speech), boycotting or any other overt concomitant of a strike unless a majority in a collective bargaining unit of the employes of an employer against whom such acts are primarily directed have voted by secret ballot to call a strike. . . . (h) To take unauthorized possession of property of the employer or to engage in any concerted effort to interfere with production except by leaving the premises in an orderly manner for the purpose of going on strike." Wis. Stat. (1947) c. 111, § 111.06 (2).

[2] U. S. Const., Art. 1, § 8, Cl. 3, giving the Congress power "To regulate Commerce . . . among the several States . . . ."

[3] 49 Stat. 449; 29 U. S. C. §§ 151–166.

[4] 61 Stat. 136; 29 U. S. C. §§ 141–197.

[5] 250 Wis. 550, 27 N. W. 2d 875. The State Supreme Court concluded that petitioners were guilty of unfair labor practices as defined in §§ 111.06 (2) (a), (e) and (h) of the Wisconsin statutes. Those provisions are set out in note 1.

negotiated collective bargaining agreements, the last of which expired on July 1, 1944. Negotiation of a new one reached a deadlock and bargaining sessions continued for some time without success.

On November 3, 1945, its leaders submitted to the Union membership a plan for a new method of putting pressure upon the employer. The stratagem consisted of calling repeated special meetings of the Union during working hours at any time the Union saw fit, which the employees would leave work to attend. It was an essential part of the plan that this should be without warning to the employer or notice as to when or whether the employees would return. The device was adopted and the first surprise cessation of work was called on November 6, 1945; thereafter, and until March 22, 1946, such action was repeated on twenty-six occasions. The employer was not informed during this period of any specific demands which these tactics were designed to enforce nor what concessions it could make to avoid them.[6]

This procedure was publicly described by the Union leaders as a new technique for bringing pressure upon the employer. It was, and is, candidly admitted that these tactics were intended to and did interfere with production and put strong economic pressure on the employer, who was disabled thereby from making any dependable production plans or delivery commitments. And it was said that "this can't be said for the strike. After the initial surprise of the walkout, the company knows what it has to do and plans accordingly." It was

---

[6] Petitioners suggest that the stoppages were initiated to force the employer to comply with a War Labor Board directive. However, the stoppages began several weeks before that directive reached either the Union or the employer. By the latter date, the National Board had been abolished. Consequently the issuance of the directive would not seem to throw any light on the Union's motives or to have any effect on the State Board's jurisdiction.

commended as a procedure which would avoid hardships that a strike imposes on employees and was considered "a better weapon than a strike."

The employer did not resort to any private disciplinary measures such as discharge of the employees; instead, it sought a much less drastic remedy by plea to the appropriate public authority under Wisconsin law [7] to investigate and adjudge the Union's conduct under the law of the State. After the prescribed procedures, the Board ordered the Union to cease and desist from "(a) engaging in any concerted efforts to interfere with production by arbitrarily calling union meetings and inducing work stoppages during regularly scheduled working hours; or engaging in any other concerted effort to interfere with production of the complainant except by leaving the premises in an orderly manner for the purpose of going on strike." [8]

Two court proceedings resulted from the Board's order: one by the Board to obtain enforcement and the other by the Union to obtain review. They are here considered, as they were below, together.

The Supreme Court of Wisconsin sustained the Board's order but significantly limited the effect of its otherwise general prohibitions. It held that what the order does, and all that it does, is to forbid individual defendants and members of the Union from engaging in concerted effort to interfere with production by doing the acts in-

---

[7] The Employment Relations Board was created by the 1939 Act. See Wis. Stat. (1947) c. 111, § 111.03. The Board's jurisdiction over unfair labor practices is delineated in § 111.07.

[8] The Board also ordered petitioners to cease and desist from "(b) Coercing or intimidating employes by threats of violence or other punishment to engage in any activities for the purpose of interfering with production or that will interfere with the legal rights of the employes." This provision of the order, based on evidence of some violence and threats, is not challenged here.

stantly involved. As we have heretofore pointed out, the construction placed upon such an order by the State Supreme Court is conclusive on us. *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740. Our only question is, therefore, whether it is beyond the power of the State to prohibit the particular course of conduct described.[9]

The Union contends that the statute as thus applied violates the Thirteenth Amendment in that it imposes a form of compulsory service or involuntary servitude. However, nothing in the statute or the order makes it a crime to abandon work individually (compare *Pollock* v. *Williams,* 322 U. S. 4) or collectively. Nor does either undertake to prohibit or restrict any employee from leaving the service of the employer, either for reason or without reason, either with or without notice. The facts afford no foundation for the contention that any action of the State has the purpose or effect of imposing any form of involuntary servitude.

It is further contended that the statute as applied invades rights of free speech and public assemblage guaranteed by the Fourteenth Amendment. We recently considered a similar contention in connection with other state action concerning labor relations. *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.,* and *Whitaker* v. *North Carolina,* 335 U. S. 525, and *American Federation of Labor* v. *American Sash & Door Co.,* 335

---

[9] In the consolidated case before the Circuit Court of Milwaukee County, that court denied enforcement of paragraph (a) of the Board's order forbidding the work stoppages, but upheld paragraph (b) enjoining violence and threats. See note 8. The Supreme Court approved the order in its entirety. Review of that court's action in upholding paragraph (a) is sought in these petitions by the Union and nine of its officers, seven of whom are employees of respondent corporation, and all of whom are members of the Union's Bargaining Committee.

U. S. 538. For reasons there stated, these contentions are without merit.

No serious question is presented by the Commerce Clause of the Constitution standing alone. It never has been thought to prevent the state legislatures from limiting "individual and group rights of aggression and defense" or from substituting "processes of justice for the more primitive method of trial by combat." Mr. Justice Brandeis, dissenting, *Duplex Co.* v. *Deering,* 254 U. S. 443, 488; see also *Dorchy* v. *Kansas,* 272 U. S. 306, 311, cited with approval, *Thornhill* v. *Alabama,* 310 U. S. 88, 103; and see *Hotel & Restaurant Employees' Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 437.

The substantial issue is whether Congress has protected the union conduct which the State has forbidden, and hence the state legislation must yield. When the order of the State Board and the decision of the State Supreme Court were made, the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. §§ 151–166, was in effect and questions of conflict between state and federal law were raised and decided with reference to it. However, the order imposes a continuing restraint which it is contended now conflicts with the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U. S. C. §§ 141–197, which amended the earlier statute. We therefore consider the state action in relation to both Federal Acts.

Congress has not seen fit in either of these Acts to declare either a general policy or to state specific rules as to their effects on state regulation of various phases of labor relations over which the several states traditionally have exercised control. Cf. Securities Act of 1933, § 18, 48 Stat. 74, 85, 15 U. S. C. § 77r; Securities Exchange Act of 1934, § 28, 48 Stat. 881, 903, 15 U. S. C. § 78bb; United States Warehouse Act, before and after 1931 Amendment, 39 Stat. 486, 490, 46 Stat. 1465, 7

U. S. C. § 269.  However, as to coercive tactics in labor controversies, we have said of the National Labor Relations Act what is equally true of the Labor Management Relations Act of 1947, that "Congress designedly left open an area for state control" and that the "intention of Congress to exclude States from exercising their police power must be clearly manifested." *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740, 750, 749.  We therefore turn to its legislation for evidence that Congress has clearly manifested an exclusion of the state power sought to be exercised in this case.

Congress made in the National Labor Relations Act no express delegation of power to the Board to permit or forbid this particular union conduct, from which an exclusion of state power could be implied.  The Labor Management Relations Act declared it to be an unfair labor practice for a union to induce or engage in a strike or concerted refusal to work where an object thereof is any of certain enumerated ones.  § 8 (b) (4), 61 Stat. 140, 141; 29 U. S. C. § 158 (b) (4).  Nevertheless the conduct here described is not forbidden by this Act and no proceeding is authorized by which the Federal Board may deal with it in any manner.  While the Federal Board is empowered to forbid a strike, when and because its purpose is one that the Federal Act made illegal, it has been given no power to forbid one because *its method is illegal*—even if the illegality were to consist of actual or threatened violence to persons or destruction of property.  Policing of such conduct is left wholly to the states. In this case there was also evidence of considerable injury to property and intimidation of other employees by threats and no one questions the State's power to police coercion by those methods.[10]

---

[10] See notes 8 and 9.

It seems to us clear that this case falls within the rule announced in *Allen-Bradley* [11] that the state may police these strike activities as it could police the strike activities there, because "Congress has not made such employee and union conduct as is involved in this case subject to regulation by the federal Board." There is no existing or possible conflict or overlapping between the authority of the Federal and State Boards, because the Federal Board has no authority either to investigate, approve or forbid the union conduct in question. This conduct is governable by the State or it is entirely ungoverned.

This case is not analogous to *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767, on which petitioners rely. There the State Board undertook to determine the bargaining unit in an industry, an identical question which the Federal Board was authorized to determine, and the two had deliberately laid down contrary policies to govern decisions of this same matter. In that case, of course, the federal policy was necessarily given effect as the supreme law of the land. See also *La Crosse Telephone Corporation* v. *Wisconsin Employment Relations Board, ante,* p. 18.

But it is claimed that the congressional labor legislation confers upon or recognizes and declares in unions and employees certain rights, privileges or immunities in connection with strikes and concerted activities, and that these are denied by the State's prohibition as laid down in this case. It is elementary that what Congress constitutionally has given, the state may not constitutionally take away. *Hill* v. *Florida,* 325 U. S. 538.

The argument is that two provisions, found in §§ 7 and 13 of the National Labor Relations Act, not relevantly changed by the Labor Management Relations Act of

---

[11] *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740, 749.

1947, grant to the Union and its members the right to put pressure upon the employer by the recurrent and unannounced stoppage of work. Both Acts provide that "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." [12] Because the acts forbidden by the Wisconsin judgment are concerted activities and had a purpose to assist labor organizations in collective bargaining, it is said to follow that they are federally authorized and thereby immunized from state control.

It is urged here that we are bound to hold these activities protected by § 7 because that has become the settled interpretation of the Act by the Board charged with its administration. This contention is based on decisions by the Board in *American Mfg. Concern,* 7 N. L. R. B. 753; *Harnischfeger Corp.,* 9 N. L. R. B., 676; *The Good Coal Co.,* 12 N. L. R. B. 136; *Armour & Co.,* 25 N. L. R. B. 989; *Cudahy Packing Co.,* 29 N. L. R. B. 837; and *Mt. Clemens Pottery Company,* 46 N. L. R. B. 714. We do not think it can fairly be said that even the cumulative effect of those cases amounts to a fixed Board interpretation that all work stoppages are federally protected concerted activities. In those cases, but in a context of antiunion animus on the employer's part, the Board condemned as unfair labor practices summary discharges attempted in retaliation for isolated work stoppages re-

---

[12] § 7 of National Labor Relations Act, 49 Stat. 449, 452. The Labor Management Relations Act of 1947 added a proviso that employees also have the right to refrain from any or all activities mentioned in this section, except to the extent that the right to refrain might conflict with an agreement requiring membership in a union as a condition of employment as authorized by the Act. 61 Stat. 140.

flecting temporary rebellion over rules or conditions of work. The drastic remedy of discharge, so outweighing any possible damage in those cases to the employer and so tainted by antiunion motives, led to the Board's conclusion of unfair labor practices proscribed by the Act. The Board, however, made it clear in the *Harnischfeger* and *Armour* cases that such a conclusion does not necessarily follow a finding that the employees' activities were concerted:

> ". . . Section 7 of the Act expressly guarantees employees the right to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. We do not interpret this to mean that it is unlawful for an employer to discharge an employee for *any* activity sanctioned by a union or otherwise in the nature of collective activity. The question before us is, we think, whether this particular activity was so indefensible, under the circumstances, as to warrant the respondent, under the Act, in discharging the stewards for this type of union activity. We do not think it was." [13]

In view of that statement, the facts of the present case do not bring it within the protection of the Act as administered by the Board. Here the employer has resorted to no retaliatory measures and its motive in asking help from the State is not even alleged to be antiunion but merely a desire to keep its plant in operation. The remedy sought against repeated disruption of production is not summary dismissal but invocation of a statutory procedure made available by the State for the adjudication and resolution of such difficulties. Consequently, we do not find any fixed Board policy to apply the Act to such facts as we have here. The quoted state-

---

[13] 9 N. L. R. B. 676, 686; 25 N. L. R. B. 989, 996.

ment from the Board's two opinions indicates lack of belief that it was creating any such rule.

However, in no event could the Board adopt such a binding practice as to the scope of § 7 in the light of the construction, with which we agree, given to § 7 by the Courts of Appeals, authorized to review Board orders. In similar cases they have denied comparable work stoppages the protection of that section. *C. G. Conn, Ltd.* v. *Labor Board,* 108 F. 2d 390; *Labor Board* v. *Condenser Corp.,* 128 F. 2d 67; *Home Beneficial Life Ins. Co.* v. *Labor Board,* 159 F. 2d 280; and see *Labor Board* v. *Draper Corp.,* 145 F. 2d 199; *Labor Board* v. *Indiana Desk Co.,* 149 F. 2d 987. To hold that the alleged fixed Board interpretation has irrevocably labeled all concerted activities "protected" would be in the teeth of the Board's own language and would deny any effect to the Courts of Appeals' decisions. The latter decisions and our own, *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240; *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31; *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332; *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740; and see *Hotel & Restaurant Employees' Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 437, clearly interdict any rule by the Board that every type of concerted activity is beyond the reach of the states' adjudicatory machinery. The bare language of § 7 cannot be construed to immunize the conduct forbidden by the judgment below and therefore the injunction as construed by the Wisconsin Supreme Court does not conflict with § 7 of the Federal Act.

In the light of labor movement history, the purpose of the quoted provision of the statute becomes clear. The most effective legal weapon against the struggling labor union was the doctrine that concerted activities were conspiracies, and for that reason illegal. Sec-

tion 7 of the National Labor Relations Act took this conspiracy weapon away from the employer in employment relations which affect interstate commerce. No longer can any state, as to relations within reach of the Act, treat otherwise lawful activities to aid unionization as an illegal conspiracy merely because they are undertaken by many persons acting in concert.[14] But because legal conduct may not be made illegal by concert, it does not mean that otherwise illegal action is made legal by concert.

Reliance also is placed upon § 13 of the National Labor Relations Act, which provided, "Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike." 49 Stat. 449, 457. The 1947 Amendment carries the same provision but that Act includes a definition. Section 501 (2) says that when used in the Act "The term 'strike' includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slow-down or other concerted interruption of operations by employees." 61 Stat. 161.

This provision, as carried over into the Labor Management Relations Act, does not purport to create, establish or define the right to strike. On its face it is narrower in scope than § 7—the latter would be of little significance if "strike" is a broader term than "concerted activity." Unless we read into § 13 words which Congress omitted

---

[14] With respect to activities subject to state control, § 111.04 of the Wisconsin statutes provides that employees shall have the right of self-organization, the right to form, join and assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection. Section 111.06 (1) makes it an unfair labor practice for an employer to interfere with, restrain or coerce his employees in the exercise of the rights guaranteed in § 111.04, and lists other unfair labor practices which the Board is also empowered to prevent.

and a sense which Congress showed no intention of including, all that this provision does is to declare a rule of interpretation for the Act itself which would prevent any use of what originally was a novel piece of legislation to qualify or impede whatever right to strike exists under other laws. It did not purport to modify the body of law as to the legality of strikes as it then existed. This Court less than a decade earlier had stated that law to be that the state constitutionally could prohibit strikes and make a violation criminal. It had unanimously adopted the language of Mr. Justice Brandeis that "Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike." *Dorchy* v. *Kansas,* 272 U. S. 306, 311. Dissenting views most favorable to labor in other cases had conceded the right of the state legislature to mark the limits of tolerable industrial conflict in the public interest. *Duplex Co.* v. *Deering,* 254 U. S. 443, 488. This Court has adhered to that view. *Thornhill* v. *Alabama,* 310 U. S. 88, 103. The right to strike, because of its more serious impact upon the public interest, is more vulnerable to regulation than the right to organize and select representatives for lawful purposes of collective bargaining which this Court has characterized as a "fundamental right" and which, as the Court has pointed out, was recognized as such in its decisions long before it was given protection by the National Labor Relations Act. *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1, 33.

As to the right to strike, however, this Court, quoting the language of § 13, has said, 306 U. S. 240, 256, "But this recognition of 'the right to strike' plainly contemplates a lawful strike,—the exercise of the unquestioned right to quit work," and it did not operate to legalize the sit-down strike, which state law made illegal and state authorities punished. *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240. Nor, for example, did it make legal a strike that ran afoul of federal law, *Southern S. S. Co.* v. *Labor Board,*

316 U. S. 31; nor one in violation of a contract made pursuant thereto, *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332; nor one creating a national emergency, *United States* v. *United Mine Workers,* 330 U. S. 258.

That Congress has concurred in the view that neither § 7 nor § 13 confers absolute right to engage in every kind of strike or other concerted activity does not rest upon mere inference; indeed the record indicates that, had the courts not made these interpretations, the Congress would have gone as far or farther in the direction of limiting the right to engage in concerted activities including the right to strike. The House Committee of Conference handling the bill which became the Labor Management Relations Act, on June 3, 1947 advised the House to recede from its disagreement with the Senate and to accept the present text upon grounds there stated under the rubric "Rights of Employees." H. R. Rep. No. 510, 80th Cong., 1st Sess., p. 38. The Committee pointed out that "the courts have firmly established the rule that under the existing provisions of section 7 of the National Labor Relations Act, employees are not given any right to engage in unlawful or other improper conduct. In its most recent decisions the Board has been consistently applying the principles established by the courts. . . ." And "it was believed that the specific provisions in the House bill excepting unfair labor practices, unlawful concerted activities, and violation of collective bargaining agreements from the protection of section 7 were unnecessary. Moreover, there was real concern that the inclusion of such a provision might have a limiting effect and make improper conduct not specifically mentioned subject to the protection of the act." The full text of this section of the report is printed in the margin.[15]

---

[15] "Both the House bill and the Senate amendment in amending the National Labor Relations Act preserved the right under section 7 of that act of employees to self-organization, to form, join, or assist

Thus, the obvious purpose of the Labor Management Amendments was not to grant a dispensation for the strike but to outlaw strikes when undertaken to enforce

any labor organization, and to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. The House bill, however, made two changes in that section of the act. *First*, it was stated specifically that the rights set forth were not to be considered as including the right to commit or participate in unfair labor practices, unlawful concerted activities, or violations of collective bargaining contracts. *Second*, it was specifically set forth that employees were also to have the right to refrain from self-organization, etc., if they chose to do so.

"The first change in section 7 of the act made by the House bill was inserted by reason of early decisions of the Board to the effect that the language of section 7 protected concerted activities regardless of their nature or objectives. An outstanding decision of this sort was the one involving a 'sit down' strike wherein the Board ordered the reinstatement of employees who engaged in this unlawful activity. Later the Board ordered the reinstatement of certain employees whose concerted activities constituted mutiny. In both of the above instances, however, the decision of the Board was reversed by the Supreme Court. More recently, a decision of the Board ordering the reinstatement of individuals who had engaged in mass picketing was reversed by the Circuit Court of Appeals (*Indiana Desk Co.* v. *N. L. R. B.*, 149 Fed. (2d) 987) (1944).

"Thus the courts have firmly established the rule that under the existing provisions of section 7 of the National Labor Relations Act, employees are not given any right to engage in unlawful or other improper conduct. In its most recent decisions the Board has been consistently applying the principles established by the courts. For example, in the *American News Company case* (55 N. L. R. B. 1302) (1944) the Board held that employees had no right which was protected under the act to strike to compel an employer to violate the wage stabilization laws. Again, in the *Scullin Steel case* (65 N. L. R. B. 1294) and in the *Dyson case* (decided February 7, 1947), the Board held that strikes in violation of collective bargaining contracts were not concerted activities protected by the act, and refused to reinstate employees discharged for engaging in such activities. In the second *Thompson Products case* (decided February 21, 1947) the Board held that strikes to compel the employer to vio-

what the Act calls unfair labor practices, an end which would be defeated if we sustain the Union's claim in this respect. By § 8 (b) (4), strikes to attain named ob-

late the act and rulings of the Board thereunder were not concerted activities protected by the provisions of section 7. The reasoning of these recent decisions appears to have had the effect of overruling such decisions of the Board as that in *Matter of Berkshire Knitting Mills* (46 N. L. R. B. 955 (1943)), wherein the Board attempted to distinguish between what it considered as major crimes and minor crimes for the purpose of determining what employees were entitled to reinstatement.

"By reason of the foregoing, it was believed that the specific provisions in the House bill excepting unfair labor practices, unlawful concerted activities, and violation of collective bargaining agreements from the protection of section 7 were unnecessary. Moreover, there was real concern that the inclusion of such a provision might have a limiting effect and make improper conduct not specifically mentioned subject to the protection of the act.

"In addition, other provisions of the conference agreement deal with this particular problem in general terms. For example, in the declaration of policy to the amended National Labor Relations Act adopted by the conference committee, it is stated in the new paragraph dealing with improper practices of labor organizations, their officers, and members, that the 'elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed.' This in and of itself demonstrates a clear intention that these undesirable concerted activities are not to have any protection under the act, and to the extent that the Board in the past has accorded protection to such activities, the conference agreement makes such protection no longer possible. Furthermore, in section 10 (c) of the amended act, as proposed in the conference agreement, it is specifically provided that no order of the Board shall require the reinstatement of any individual or the payment to him of any back pay if such individual was suspended or discharged for cause, and this, of course, applies with equal force whether or not the acts constituting the cause for discharge were committed in connection with a concerted activity. Again, inasmuch as section 10 (b) of the act, as proposed to be amended by the conference agreement, requires that the rules of evidence applicable in the district courts shall, so far as practicable, be followed and applied by the Board,

jectives are made unfair labor practices; and by § 10 (a),[16] the Board is authorized to prevent them. The definition plainly enough was designed to enable the Board to order a union to cease and desist from a strike so made illegal, whether it consisted of a strike in the usual or conventional meaning or consisted of some of the other practices mentioned in the definition. However, if we add the definition to § 13, it does not change the effect of the Act on state powers. It still gives the Federal Board no authority to prohibit or to supervise the activity which the State Board has here stopped nor to entertain any proceeding concerning it, because it is the objectives only and not the tactics of a strike which bring it within the power of the Federal Board. And § 13 plus the definition only provides that "Nothing in this Act . . . shall be construed so as either to interfere with or impede" the right to engage in these activities. What other Acts or other state laws might do is not attempted to be regu-

---

proof of acts of unlawful conduct cannot hereafter be limited to proof of confession or conviction thereof.

"The second change made by the House bill in section 7 of the act (which is carried into the conference agreement) also has an important bearing on the kinds of concerted activities which are protected by section 7. That provision, as heretofore stated, provides that employees are also to have the right to refrain from joining in concerted activities with their fellow employees if they choose to do so. Taken in conjunction with the provisions of section 8 (b) (1) of the conference agreement (which will be hereafter discussed), wherein it is made an unfair labor practice for a labor organization or its agents to restrain or coerce employees in the exercise of rights guaranteed in section 7, it is apparent that many forms and varieties of concerted activities which the Board, particularly in its early days, regarded as protected by the act will no longer be treated as having that protection, since obviously persons who engage in or support unfair labor practices will not enjoy immunity under the act."

[16] 61 Stat. 136, 146, 29 U. S. C. § 160 (a).

lated by this section. Since reading the definition into § 13 confers neither federal power to control the activities in question nor any immunity from the exercise of state power in reference to them, it can have no effect on the right of the State to resort to its own reserved power over coercive conduct as it has done in this instance.

If we were to read § 13 as we are urged to do, to make the strike an absolute right and the definition to extend the right to all other variations of the strike,[17] the effect would be to legalize beyond the power of any state or federal authorities to control not only the intermittent stoppages such as we have here but also the slowdown and perhaps the sit-down strike as well. Cf. *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740, 751. And this is not all; the management also would be disabled from any kind of self-help to cope with these coercive tactics of the union except to submit to its undeclared demands. To dismiss or discipline employees for exercising a right given them under the Act or to interfere with them or the union in pursuing it is made an unfair labor practice and if the rights here asserted are rights conferred by the Labor Management Relations Act, it is hard to see how the management can take any steps to resist or combat them without incurring the sanctions of the Act. It is certain that such a result would be inconsistent with the whole purpose disclosed by the Labor Management Relations Act amendments to the National Labor Relations Act. Nor do we think such is the result of any fair interpretation of the text of the Act.

We think that this recurrent or intermittent unannounced stoppage of work to win unstated ends was

---

[17] To call these stoppages a strike we would have to ignore petitioners' own conception of this activity. As we have shown, they adopted this technique precisely because it was believed to be "better than a strike." See text, pp. 249–250.

neither forbidden by federal statute nor was it legalized and approved thereby. Such being the case, the state police power was not superseded by congressional Act over a subject normally within its exclusive power and reachable by federal regulation only because of its effects on that interstate commerce which Congress may regulate. *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1; *Bethlehem Steel Co.* v. *Board,* 330 U. S. 767.

We find no basis for denying to Wisconsin the power, in governing her internal affairs, to regulate a course of conduct neither made a right under federal law nor a violation of it and which has the coercive effect obvious in this device.

The judgments are

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE RUTLEDGE concur, dissenting.

This strike was legal under the Wagner Act in 1945 and 1946 and its legality was not affected by the Labor Management Relations Act of 1947. I think, therefore, that the effort of Wisconsin to make it unlawful must fail because it conflicts with the national policy.

Section 13 of the Wagner Act is written in language too plain to admit of doubt or ambiguity: "Nothing in this Act shall be construed so as to interfere with or impede or diminish in any way the right to strike." The Court held in *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240, 256, that by this provision Congress "recognized the right to strike,—that the employees could lawfully cease work at their own volition because of the failure of the employer to meet their demands." The congressional policy of protection of strikes as economic sanctions is now converted into a congressional policy of hands-off.

If the States can outlaw this strike, I see no reason why they cannot adopt regulations which determine the manner in which strikes may be called in these interstate

industries. Can they in practical effect outlaw strikes by requiring a unanimous vote of the workers in order to call one? The federal Board is not authorized, it is said, to forbid or control strikes because of the method by which they are called or the way in which they are utilized. If that is the criterion, as the Court declares, then the manner of calling of strikes is left wholly to the States. The right to strike, which Congress has sanctioned, can in that way be undermined by state action. The federal policy thus becomes a formula of empty words.

That conclusion is made all the more surprising when § 13 of the Act is read in conjunction with § 7 which provides, "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, *and to engage in concerted activities,* for the purpose of collective bargaining *or other mutual aid or protection.*" [1] (Italics added.) Section 7 read in conjunction with § 13 must mean that one of the "concerted activities" in which employees may engage is to strike in these interstate industries. In all of labor's history no "concerted activity" has been more conspicuous and important than the strike; and none was thought to be more essential to recognition of the right to collective bargaining. Moreover, the strike historically and in the present cases was used to make effective the collective bargaining power which § 7 of the Wagner Act guarantees. The right to

---

[1] It was held in *Labor Board* v. *Peter C. K. Swiss Choc. Co.,* 130 F. 2d 503, 505, 506, that the right to engage in a sympathetic strike or a secondary boycott was a concerted activity protected by § 7 prior to the 1947 amendments. It was also held in *Labor Board* v. *Remington Rand, Inc.,* 94 F. 2d 862, 871, that a strike because of an employer's refusal to negotiate was protected by § 13, and employees so engaged could recover their positions even at the expense of workers hired to replace them during the strike.

strike, recognized by § 13, is thus an integral part of the federal labor-management policy.

Section 7 was invoked in *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740, 750, to challenge as unconstitutional Wisconsin's regulation of picketing, threats, and violence in connection with labor disputes. We disallowed the defense, holding that those matters were problems within the reach of the traditional police power of the States and remained there after passage of the federal Act because it had not undertaken to regulate them.

The Wagner Act, to be sure, did not undertake to give the federal agency control over the manner of calling strikes or the purpose for which they may be called. To that extent these cases have common ground with the *Allen-Bradley* decision. But there the similarity ends. In *Allen-Bradley* the Congress had not expressed a policy on picketing, threats or violence in connection with labor disputes. In this case, as § 13 read in conjunction with § 7 makes plain, it has adopted a policy on strikes.

It is the presence of a conflicting federal policy that determines whether state action must give way under the Supremacy Clause,[2] even though there may be no actual or potential collision between federal and state administrative agencies. *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218. In *Hill* v. *Florida,* 325 U. S. 538, a state regulation of the licensing of business agents of unions subject to the federal Act was held to be in conflict with the Wagner Act not because the federal Board had any licensing jurisdiction but because the state law interfered with the freedom of collective bargaining guaranteed by § 7 of the Act. The present cases follow *a fortiori,* if the strike is included in the "concerted activities" guaranteed by § 7.

---

[2] Article VI, Clause 2 of the Constitution.

The concerted activities in these cases were as old as labor's struggle for existence and were aimed at (as well as a part of) the purposes which § 7 of the federal Act was designed to protect.[3] Therefore the legality of the methods used is exclusively a question of federal law.[4]

MR. JUSTICE MURPHY, with whom MR. JUSTICE RUTLEDGE concurs, dissenting.

To interfere with production and to enforce their bargaining demands, employees of Briggs and Stratton called twenty-seven union meetings during working hours with-

[3] Although this litigation is controlled by the Wagner Act, there is nothing in the Labor Management Relations Act of 1947 that suggests that Congress wished to withdraw its protection from the right to strike except to the extent specially provided by the amendments to the Act. See S. Rep. No. 105, 80th Cong., 1st Sess. 28 (1947). It makes some strikes unfair labor practices. 61 Stat. 141, 29 U. S. C. § 158 (b). But the strikes so condemned concededly do not include the kind we have in the present cases. The amendments to §§ 7 and 13, 29 U. S. C. §§ 157, 163, do not restrict the right as it previously existed. Moreover, the 1947 legislation comprehensively defines a strike, 29 U. S. C. § 142, as "any concerted slow-down or other concerted interruption of operations by employees," which is broad enough to include the activity which Wisconsin has condemned here.

[4] The Court heretofore has held that the measure of the right to strike in these interstate industries is a question of federal law. *Labor Board* v. *Fansteel Corp.*, 306 U. S. at 255–257. Thus § 2 (3) of the Wagner Act defined employee to "include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute . . . ." 49 Stat. 450, 29 U. S. C. § 152 (3). In accordance with this section the Court has held that participation in a strike did not remove workers from the protection of the Act and that they retained the status of employees. See *Labor Board* v. *Mackay Co.*, 304 U. S. 333, 345–347. The question of what is a "labor dispute" within the meaning of § 2 (3) necessarily involves a consideration of whether the strike was or was not justified. See *Labor Board* v. *Stackpole Carbon Co.*, 105 F. 2d 167, 176.

Determination of the legality of strikes in interstate industries by federal law is necessary if the administration of the federal system

out advance notice to the employer. Employees left their work and returned later in the day, or the following day. Wisconsin has made this concerted activity unlawful. The question is whether the State's action violates the federal guarantee contained in § 7 of the Wagner and Taft-Hartley Acts: "Employees shall have the right to . . . engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

We have recognized that the phrase "concerted activities" does not make every union activity a federal right. We have held that violence by strikers is not protected, *Allen-Bradley Local* v. *Wisconsin Employment Relations Board,* 315 U. S. 740; that a sit-down strike, *Labor Board* v. *Fansteel Corp.,* 306 U. S. 240, a mutiny, *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31, and a strike in violation of a contract, *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332, must be withdrawn from the literal language of § 7.

But the Court, by its reasoning and its quotation from a Congressional report, now makes intermittent work stoppages the equivalent of mutiny, contract-breaking, and the sit-down strike. It stretches the "objectives and means" test to include a form of pressure which is peaceful and direct. In effect, it adopts the employer's plea that it cannot plan production schedules, cannot notify its customers and suppliers, cannot determine its output with any degree of certainty and that these inconveniences withdraw this activity from § 7 of the national statutes. The majority and the Wisconsin court call the weapon objectionable, then, only because it is effective.

of labor-management relations is to be uniform and harmonious. The status of workers as employees will determine what relief they may be entitled to under the federal Act. See *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177. Reinstatement rights may indeed depend on whether a worker has lost his status as an employee through activities not comprehended in the federal protection of the right to strike. *Labor Board* v. *Fansteel Corp., supra.*

270

To impute this rationale to the Congress which enacted the Wagner Act is, in my opinion, judicial legislation of an extreme form.

The Court chooses to ignore the consistent policy of the agency charged with primary responsibility in interpreting and administering § 7. The National Board has repeatedly held that work stoppages of this nature are "partial strikes" and "concerted activities" within the meaning of § 7. *Cudahy Packing Company,* 29 N. L. R. B. 837, 863; *Armour & Company,* 25 N. L. R. B. 989; *The Good Coal Company,* 12 N. L. R. B. 136, 146; *American Mfg. Concern,* 7 N. L. R. B. 753, 758; *Harnischfeger Corporation,* 9 N. L. R. B. 676, 685; *Mt. Clemens Pottery Company,* 46 N. L. R. B. 714, 716. In each of these six cases, the Board's interpretation of § 7 is directly contrary to that reached by the Court in the case before us. In each case the Board concluded that work stoppages or "partial strikes" cannot be withdrawn from the language of § 7. To ignore the Board's consistent rulings in this case is a new and unique departure from the rule of deference to settled administrative interpretation. The fact that the stoppages in the Board cases were fewer in number than those at Briggs and Stratton is not, of course, a controlling difference—unless we are to say that the stoppages are not protected by § 7 because they are effective from the union's point of view.

Wisconsin's action clearly conflicts with § 7, and accordingly, I would reverse the judgment.