**AMERICAN SMELTING AND REFIN-ING COMPANY, a New Jersey corporation, Plaintiff**

v.

**TACOMA SMELTERMEN'S UNION LO-CAL NO. 25, INTERNATIONAL UN-ION OF MINE, MILL AND SMELTER WORKERS, a labor organization; and International Union of Mine, Mill and Smelter Workers, a labor organization, Defendants.**

No. 2403.

United States District Court
W. D. Washington, S. D.
April 24, 1959.

Holman, Mickelwait, Marion, Black & Perkins, Burroughs B. Anderson and H. Weston Foss, Seattle, Wash., for plaintiff.

John Caughlan, Seattle, Wash., for Local No. 25.

Nathan Witt, New York City, for International Union of Mine, Mill and Smelter Workers.

BOLDT, District Judge.

This action was brought under Section 301 of the Labor-Management Relations Act of 1947 (29 U.S.C.A. § 185) seeking damages and equitable relief for the alleged violation of a collective bargaining agreement between an employer and a labor organization representing employees in an industry affecting commerce.

The ultimate questions presented in this hearing on plaintiff's motion for issuance of a temporary injunction and restraining order are limited to: (1) Does this court have jurisdiction even to consider granting any equitable relief under any conceivable circumstances within the issues framed by the pleadings in the case? (2) Assuming an affirmative answer to the first question, what, if any, interlocutory or temporary equitable re-

lief can and should be granted pending trial of the case on its merits?

Decision of the stated questions requires, first and foremost, an interpretation of the collective bargaining agreement on which the action is based. At a previous hearing counsel for both sides, without any reservations or exceptions, agreed that such interpretation would be required and counsel were forewarned to present at this hearing any evidence thought necessary to enable the court to properly interpret the contract.

It is not surprising that no evidence has been offered by either side as purporting to bear upon the interpretation of the contract, because the contract language is so clear and simple as to leave not the remotest doubt what the contract means and what the parties intended it to mean. Certainly that would be true if this were a contract between parties in any other relationship under any circumstances. If it were a contract between parties concerned with any matter other than labor relations in the operation of an industrial plant, there would be no difficulty whatever in understanding what this contract requires of each of the parties with respect to the subject with which we are concerned in this litigation.

The contract provides "that in order to define the rights of the Company's employees and the Union so as to provide peaceful adjustment of differences which may arise from time to time between the Company and its employees, or the Union, the parties hereto agree as follows: * * *" That is what these parties said their purpose was and what they meant to do when they entered into this agreement. They intended to provide in the contract for a method of peaceful adjustment of any differences which might arise from time to time between the Company and its employees or the Union, and for that purpose they agreed as provided in the succeeding provisions: Article I, Recognition and Dues Deductions; Article II, Workweek and Overtime; Article III, Dust Differential; Article IV, Shift Differential; Article V, Holidays; Article VI, Vacations; Article VII, Health and Welfare; each of these articles containing detailed provisions controlling the matters designated by the general headings.

Article VIII is designated "Grievance Procedure." Paragraph A thereof provides: "The Union agrees to elect annually a committee of six (6), who, with the Financial Secretary, will represent the Union as a bargaining committee for all employees." Paragraph B provides: "*Any* grievance or misunderstanding concerning *any* ruling, practice or working condition, or *any* dispute arising as to the meaning, application or claim of violation of *any* provision of this agreement or *any* grievance between an employee and his foreman *shall be* handled as follows:" (Emphasis added.) This language is as sweeping, all inclusive and emphatic as could be used to describe the kind of disputes and grievances to be handled by the grievance procedure, and to mandatorily bind the parties to follow such procedure during the term of the contract.

Subparagraph B(1) then provides that any grievance concerning such a ruling, practice, condition or misunderstanding et cetera "shall be taken up by the employee with his foreman within seven (7) working days, and the department shop steward shall be present. If desired, the grievance may be taken up further with the departmental assistant superintendent and in turn with the General Superintendent. If desired, the Business Agent may be present." These quoted words provide Step One of the agreed grievance procedure.

Subparagraph B(2) then describes Step Two as follows: "If no settlement is reached under (1), the grievance shall be presented in writing for consideration at a meeting between Management and the Committee of the Union. Any settlement arrived at under Step 2 shall be reduced to writing and, after acceptance, copies shall be provided for the Union Business Agent, the departmental supervisor and the foreman involved."

Subparagraph B(3) prescribes the final phase of grievance procedure: "If

no agreement is reached under (1) and (2) the Union may, within twenty (20) calendar days after written decision from the Management in Step (2), invoke arbitration by written notice to the Company, * * *. All grievances shall be settled by the terms of this agreement. No grievance will be processed unless the procedure as outlined above has been followed. If Management's decision in Step (2) is not appealed by the Union's invoking arbitration within the time limit of twenty (20) calendar days provided, the particular grievance shall be deemed closed in accordance with the decision in that step." It is difficult to imagine how any bona fide misunderstanding of the plain import and emphasis of this simple and direct language could arise.

Finally, subparagraph F provides: "There shall be no work stoppage nor a threat of the same on the part of an individual or a group, nor a lockout on the part of the Company, while a grievance is in the course of being presented, investigated, considered, or arbitrated. In the event of such a stoppage, any investigation, consideration, or arbitration of the grievance will be automatically suspended until such stoppage is ended and the employees have returned to work."

The remaining eleven articles of the contract pertain to seniority and various other subjects.

It is clear that when this contract was entered into these parties agreed, by language unqualified and unequivocal, that the grievance procedure stated in the contract would be the method, mandatory and exclusive on the part of both Company and Union, by which any and all grievances arising between the parties would be adjusted and concluded. It is perfectly plain that if any conceivable difference, dispute or grievance is not closed at Step One as provided in Article VIII B(1), then Step Two as provided in Article VIII B(2) may be invoked. According to the terms of the contract, this step then concludes with a decision by Management stating its position with respect to the grievance.

Article VIII B(3) simply provides that the Union may, if it wishes, challenge Management's decision under Step Two by applying for arbitration within 20 days. If the Union does not so challenge the decision as made by Management in Step Two, the following specific provision of the contract comes into effect: "If Management's decision in Step (2) is not appealed by the Union's invoking arbitration within the time limit of twenty (20) calendar days provided, the particular grievance shall be deemed closed in accordance with the decision in that step." The matter could hardly be stated more plainly or emphatically.

It does not seem open to any reasonable doubt but that whatever the nature of the grievance, difference, or dispute arising between the Company and its employees or their Union, the contract provides a clearly stated method for its investigation, adjustment and settlement. It is also equally clear that the parties intended this to be the only means by which controversies between them should be adjusted and concluded and so provided in their contract, stating that its purpose was "to define the rights of the Company's employees and the Union so as to provide peaceful adjustment of differences which may arise from time to time between the Company and its employees, or the Union."

Under the circumstances shown by the evidence, the fact that the plant is not in operation, in and of itself, indisputably shows that either the Company or the Union, or both, have failed and refused to follow and abide by the grievance procedure provided by the contract. It seems inappropriate at this time to make a final determination as to whether either or both parties have been guilty of such failure and refusal to comply with the contract, because decision on that matter may be the turning point of the ultimate decision of the basic case. However, on the evidence now submitted, there can be no reasonable doubt but that it was the union officials who refused either to accept the management decision in Step Two of the grievance procedure

or to apply for arbitration as required by the express language of the contract.

The defendant unions in this hearing have not claimed or offered evidence of any breach by the plaintiff company of any grievance procedure or of any other provision of the contract. It may be that counsel for the defendants, feeling the jurisdictional issue dispositive of the matter, did not present evidence of contract breach by plaintiff that might otherwise have been offered. Of course, they will not be precluded from doing so at trial on the merits of the basic case.

It does not seem necessary to decide whether this contract, under any and all conceivable circumstances, denies employees the right to strike, or for that matter, denies the Company the right to a lockout. This is because the situation giving rise to the litigation and this particular hearing, namely, the shutdown of the smelter plant, was not created by a strike either declared or undeclared. Non-operation of the plant was caused by and resulted from unauthorized work stoppages, consisting of employees leaving their job assignments and the plant, and from other actions by employees calculated to sabotage the effective operation of the plant and to bring on its ultimate closure. Without serious doubt, this conduct was induced, directed and ordered by officers of defendant unions. The officers of the defendants must have had serious concern about their right to strike the plant because they did not threaten or declare a strike and even now claim lockout by the Company.

While the Unions did not strike the plant they made it impossible for the plant to continue to function. Such conduct was not authorized by the contract; on the contrary, it was in direct violation of the contract terms, express and implied. There has been no serious attempt on the part of defendants to traverse or to contradict the undisputed evidence to such effect. All of this leads to the question of what, if anything, this court can do about it. Parenthetically, of course, something should be done about it voluntarily by those having respect for the ob-

ligation of contracts but who heretofore may have misunderstood or misconceived the meaning of the contract and its obligations. The question is certainly not without difficulty and in frankness it must be admitted that except for the decision of the Supreme Court in Textile Workers Union of America v. Lincoln Mills of Alabama, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, this court probably would not have considered that it had jurisdiction to grant equitable relief or act in any manner other than to try the claim for damages resulting from alleged breach of contract. In the Lincoln Mills opinion Mr. Justice Douglas, speaking for the Court, emphatically stated a number of propositions under which it is difficult to see why this court is without the power and duty to specifically enforce the grievance procedures of the collective bargaining agreement in question.

The agreement in the cited case provided "that there would be no strikes or work stoppages and that grievances would be handled pursuant to a specified procedure." 353 U.S. at page 449, 77 S.Ct. at page 914. Likewise, the contract in the present case provides that there shall be no work stoppages, and that disputes shall be disposed of as provided in the grievance procedure. There seems to be very little, if any, substantial or important difference between that agreement and the one at bar, excepting, of course, in the details of how the grievance procedure should function.

The opinion further states: "Both the Senate Report and the House Report indicate a primary concern that unions as well as employees should be bound to collective bargaining contracts. * * * Thus collective bargaining contracts were made 'equally binding and enforcible on both parties.' As stated in the House Report, * * * the new provision 'makes labor organizations equally responsible with employers for contract violations and provides for suit by either against the other in the United States district courts.' * * * We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the

courts must fashion from the policy of our national labor law. * * * The range of judicial inventiveness will be determined by the nature of the problem, * * *. It is not uncommon for federal courts to fashion federal law where federal rights are concerned." 353 U.S. at pages 453–457, 77 S.Ct. at pages 916–918.

As to Norris-LaGuardia: "The question remains whether jurisdiction to compel arbitration of grievance disputes is withdrawn by the Norris-LaGuardia Act. * * * Though a literal reading might bring the dispute within the terms of the Act * * * we see no justification in policy for restricting § 301(a) to damage suits, leaving specific performance of a contract to arbitrate grievance disputes to the inapposite procedural requirements of that Act." 353 U.S. at pages 457–458, 77 S.Ct. at page 918.

Counsel for defendants suggest, however, that the above language means only that an employer can be required by specific performance to submit to arbitration when it is provided for in a collective bargaining contract, and that the provisions of the present contract do not contain any right of the Company to demand arbitration which, of course, is correct. But the contract in this case does provide that if the Union does not elect arbitration then it must accept the decision made in Step Two of the grievance procedure. Quoting again from the language used by the parties in their agreement, "If Management's decision in Step (2) is not appealed by the Union's invoking arbitration within the time limit of twenty (20)

calendar days provided, the particular grievance shall be deemed closed in accordance with the decision in that step."

The Lincoln-Mills opinion says, "Though a literal reading [of the Norris-LaGuardia Act] might bring the dispute within the terms of the Act * * *, we see no justification in policy for restricting § 301(a) [of the Taft-Hartley Act] to damage suits, leaving specific performance of a contract to arbitrate grievance disputes to the inapposite procedural requirements of that Act." 353 U.S. at page 458, 77 S.Ct. at page 918. If that language means what it plainly says, surely simple justice and common fairness would dictate that sauce for the goose be such for the gander. If, under a contract providing for either acceptance of a grievance decision or application for arbitration, the court can require one party to arbitrate, surely the court may require the other party to accept the grievance decision when such party chooses not to arbitrate. This may be a short step apart from the facts of Lincoln-Mills, but certainly it is not beyond the principle and reasoning of the case as previously quoted. Perhaps that is what the opinion refers to in the comment concerning the range of judicial inventiveness.

The first question presented on today's hearing, namely, whether this court has jurisdiction to consider the issuance of equitable relief, must be answered in the affirmative. What that relief ought to be in this posture of the case presents a problem as difficult of solution as the first question.[1] However, at a minimum, both

1. In considering these two questions the court reviewed all of the relevant statutory and case authority, including the following cases cited by counsel either in brief or during argument.

Plaintiff cited: Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed. 2d 622; Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972; General Electric Co. v. Local 205, etc., 1957, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028;

International Union, United Auto. Workers, etc. v. Wisconsin Employment Relations Board, 1949, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651; Chicago & N. W. Ry. Co. v. Order of Railroad Telegraphers, 7 Cir., 1959, 264 F.2d 254; A. H. Bull Steamship Co. v. Seafarers' Intern. Union, 2 Cir., 1957, 250 F.2d 326; Hoover Co. v. N.L.R.B., 6 Cir., 1951, 191 F.2d 380; N.L.R.B. v. Massey Gin & Machine Works, Inc., 5 Cir., 1949, 173 F.2d 758; N.L.R.B. v. Draper Corp., 4 Cir., 1944, 145 F.2d 199, 156

parties should be commanded to comply with and abide by the grievance procedure contained in the contract and any action by defendants' officers inducing, directing or assisting in violation of the obligations of the contract should be restrained pending decision of the basic action. As the contract provides, grievance procedure has been suspended by the work stoppage and, therefore, all of the controversies leading to the closing of the plant are well within the time limitation provided in the contract for contract grievance procedure. Further, plaintiff's management, with authority to do so, has disclaimed any intention to foreclose contract grievance procedure as to any inci-

dent occurring on and after March 9, provided the contract provisions pertaining to work stoppage are complied with by defendants. The order of the court will so provide.

This proceeding is continued until next Wednesday, June 29, 1959. In the interval defendants may consider whether they wish to apply for relief to higher authority, if such be available.[2] Also in that period counsel on both sides may consider what, if any, suggestions to propose concerning the precise form of interlocutory order the court may enter.

Thereafter Findings of Fact, Conclusions of Law, Restraining Order and Temporary Injunction were entered.

A.L.R. 989; United Steelworkers of America v. Enterprise Wheel & Car Corp., D.C.S.D.W.Va.1958, 168 F.Supp. 308; Honolulu Rapid Transit Co., 1954, 110 N.L.R.B. No. 244, 35 LRRM 1305; Textile Workers, CIO, 1954, 108 N.L.R.B. No. 109, 34 LRRM 1059; Pacific Telephone Co., 1954, 107 N.L.R.B. No. 301, 33 LRRM 1433; Elk Lumber Co., 1950, 91 N.L.R.B. No. 60, 26 LRRM 1493; Phelps Dodge Copper Products Corp., 1952, 101 N.L.R.B. No. 103, 31 LRRM 1072.

Defendants cited: San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garman, 1959, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775; Brotherhood of R. R. Trainmen v. Chicago R. & I. R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Milk Wagon Drivers' Union, etc. v. Lake Valley Farm Products Co., 1940, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; A. H. Bull Steamship Co. v. Seafarers' Intern. Union, 2 Cir., 1957, 250 F.2d 326, certiorari denied 355 U.S. 932, 78 S.Ct. 411, 2 L.Ed. 2d 414; Local 205, etc. v. General Electric Co., 1 Cir., 1956, 233 F.2d 85, affirmed 353 U.S. 547, 77 S.Ct. 921, 1 L. Ed.2d 1028; Brotherhood of Railway Trainmen, Local Lodge No. 721 v. Central of Georgia Ry. Co., 5 Cir., 1956, 229 F.2d 901; W. L. Mead, Inc. v. International Brotherhood, etc., 1 Cir., 1954, 217 F.2d 6; In re Third Ave. Transit Corp., 2 Cir., 1951, 192 F.2d

971; California Ass'n of Employers v. Building and Construction Trades Council, 9 Cir., 1949, 178 F.2d 175; Donnelly Garment Co. v. Dubinsky, 8 Cir., 1946, 154 F.2d 38; Carter v. Herrin Motor Freight Lines, 5 Cir., 1942, 131 F.2d 557; Donnelly Garment Co. v. International Ladies' Garment Workers' Union, 8 Cir., 1938, 99 F.2d 309; Grace Co. v. Williams, 8 Cir., 1938, 96 F.2d 478; Local Union No. 861, etc. v. Stone & Webster Engineering Corp., D.C.W.D.La. 1958, 163 F.Supp. 894; Sound Lumber Co. v. Lumber and Sawmill Workers, D.C.N.D.Cal.1954, 122 F.Supp. 925; Alcoa S.S. Co. v. McMahon, D.C.S.D. N.Y.1948, 81 F.Supp. 541, affirmed 2 Cir., 1949, 173 F.2d 567; Dean v. Mayo, D.C. W.D.La.1934, 8 F.Supp. 73; Cinderella Theatre Co. v. Sign Writers' Local Union No. 591, D.C.E.D.Mich.1934, 6 F. Supp. 164; Stanley v. Peabody Coal Co., D.C.S.D.Ill.1933, 5 F.Supp. 612.

2. Subsequent to the oral decision in this cause, the defendants applied to both the United States Court of Appeals for the Ninth Circuit and the United States Supreme Court for a stay of the temporary injunction pending appeal. On May 4, 1959 the Court of Appeals entered an order denying defendants' motion and on May 6, 1959 Justice William J. Brennan, Jr. of the United States Supreme Court also entered an order denying defendants' motion for a stay.