**STATE of Missouri, Respondent,**

v.

**LOCAL NO. 8-6, OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL-CIO, et al., Appellants.**

No. 45869.

Supreme Court of Missouri,

En Banc.

Sept. 29, 1958.

Rehearing Denied Nov. 10, 1958.

Morris J. Levin, Donald S. Siegel, St. Louis, for appellants.

John M. Dalton, Atty. Gen., Robert R. Welborn, Asst. Atty. Gen., Ely, Ely & Voorhees, Wayne Ely, St. Louis, for respondent.

Irvin Fane, Harry L. Browne, Stephen M. Reynolds, Kansas City, for Spencer, Fane, Britt & Browne, amici curiæ.

Edmonstone F. Thompson, Courtney Shands, Jr., St. Louis, for Thompson, Mitchell, Thompson & Douglas, amici curiæ.

STORCKMAN, Judge.

The defendants have appealed from a judgment of the Circuit Court of the City of St. Louis enjoining them from continuing and participating in a work stoppage and strike against the Laclede Gas Company or the State of Missouri, the plaintiff in the action. The judgment also declared the Act upon which the action is based, Ch. 295, RSMo 1949, V.A.M.S., commonly known as the King-Thompson Act, to be valid and constitutional. The defendants are officers and members of Local Unions Nos. 8–6, 8–109 and 8–194 of the Oil, Chemical and Atomic Workers International Union, AFL-CIO. Laclede Gas Company, a Missouri corporation, is an operating gas utility engaged in the distribution and sale of gas in the metropolitan area comprising the City of St. Louis and St. Louis County.

On July 1, 1956, Laclede had approximately 2500 employees. Approximately 1700 production and distribution workers were represented by Local 8–6. About 100 foremen were represented by Local 8–109, and about 400 clerical workers by Local 8–194. At all times herein mentioned, these unions were duly certified by the National Labor Relations Board as representatives of such employees for the purpose of collective bargaining.

The expiration date of the labor agreements between Laclede and its employees

was June 30, 1956, at midnight. More than sixty days before the expiration date, the employees, through their representatives, notified the company of their desire to modify the agreements. Notice of the labor dispute also was given to the Federal Mediation and Conciliation Service and to the Missouri State Board of Mediation. The labor dispute involved wages, vacations, making of riser connections and other matters. Negotiations for new labor agreements were initiated between the three local unions and Laclede and were continued through June 30, 1956. When the old contract expired without a new one being consummated, approximately 1800 employees, represented by these three unions, went on strike pursuant to a strike vote previously taken. The strike began July 1, 1956, and picket lines were set up at all offices and locations of the company, about 10 in number. About 300 supervisory employees who were not members of these unions remained on duty and undertook to continue furnishing gas to the customers, but service could not be maintained for reasons hereinafter more fully discussed.

On the afternoon of July 5, 1956, the Honorable Phil M. Donnelly, governor of the State of Missouri, issued a Proclamation and two Executive Orders which were served upon the defendants and the managing officers of Laclede. This Proclamation and the Orders were designed to effect the seizure of the utility and continue its operation in the public interest by virtue of the authority vested in the governor by the Constitution and the laws of Missouri, particularly section 295.180 of the King-Thompson Act. The Proclamation declared, after investigation, it was the governor's opinion that "the public interest, health and welfare are jeopardized" because of the interruption of the operation of the utility as a result of the labor dispute and strike and, further, that the exercise of the authority vested in the governor by section 295.180 was necessary to insure the continued operation in Missouri of the public utility.

Executive Order No. 1 stated that the governor took possession of "the plants, equipment, and all facilities of the Laclede Gas Company, located in the State of Missouri, for the use and operation by the State of Missouri in the public interest," effective as of 4 o'clock p. m. July 5, 1956.

The governor's Executive Order No. 2 provided:

"(1) That Daniel C. Rogers, Chairman of the Missouri State Board of Mediation, acting as my agent, is hereby authorized and directed to take possession of the plants, equipment and all facilities of the Laclede Gas Company in the State of Missouri or such parts of each of said plants, equipment and facilities as may be necessary for the purpose of carrying out the provisions of this Order, and to effect my Proclamation and Executive Order No. 1 declaring the public interest, health and welfare jeopardized, in order to insure that the said utility above mentioned is effectively operated in the interest of the people of this State to the end that they may have the benefit of necessary and essential public utility services.

"(2) Said Daniel C. Rogers shall exercise the aforesaid authority as my agent forthwith, and he shall continue to exercise the aforesaid authority as my agent until and unless otherwise directed by me.

"(3) All rules and regulations of the aforesaid utility governing the internal management and organization of the company, and its duties and responsibilities, shall remain in force and effect throughout the term of operation by the State of Missouri."

The employees on strike did not return to work when the governor's Proclamation and Executive Orders were issued and served upon their representatives. On July 9, 1956, the State of Missouri, in its sovereign right, filed suit seeking to restrain and enjoin the defendants from continuing the strike, basing its action upon Chapter

295 of the Revised Statutes of Missouri, and particularly § 295.180 and § 295.200 and the governor's Proclamation and Executive Orders issued pursuant thereto. The defendants' pleadings, inter alia, attacked the constitutionality of the King-Thompson Act and the validity of the Proclamation and Executive Orders of the governor and of his agent acting thereunder and also sought a declaratory judgment that Chapter 295 was unconstitutional.

Trial of the case began on July 11, 1956, and concluded on July 13, 1956. The Court adjudged and decreed that the injunction be issued as prayed and held Chapter 295 was not unconstitutional and that the Proclamation and Executive Orders issued by the governor, pursuant to the authority conferred upon him by Section 295.180, were valid and enforcible. On July 14, 1956, the day after judgment was rendered, the striking employees returned to work.

▇ Amici curiae urge us to dismiss the appeal on the ground the case is now moot. Going outside the record as permitted for this purpose, State ex rel. Donnell v. Searcy, 347 Mo. 1052, 152 S.W.2d 8, 10 (2), they assert that Laclede and its employees signed a labor agreement on August 10, 1956, and that the governor terminated his seizure of the utility on October 31, 1956, which was, however, after this appeal was taken. They contend that the injunction having expired by its own terms the appeal should be dismissed in accordance with our practice of refusing to pass on moot questions. Neither the plaintiff nor the defendants join in this request.

Among other cases, the amici curiae cite Preisler v. Doherty, 364 Mo. 596, 265 S.W.2d 404, 407(4), which holds: "A question is moot when the question presented for decision seeks a judgment upon some matter which if judgment were rendered could not have any practical effect upon any then existing controversy." One factor to be considered is that seizures of utilities in similar situations are likely to occur again and it is in the public interest that the

question of their validity be determined. Moreover, we know from our own records, No. 46,664, State of Missouri v. Local No. 8-6 et al., that another action, growing out of the same transaction, is pending in the trial court against these defendant unions to assess monetary penalties pursuant to Section 295.200, subd. 3.

▇ Where the matters connected with or growing out of the original cause have not been fully and finally disposed of and the questions presented are of public importance and likely to recur in the courts of the state, an appeal need not be dismissed as being moot although the immediate controversy has ceased to exist. State ex rel. Atchison, T. & S. F. Ry. Co. v. Trimble, 254 Mo. 542, 163 S.W. 860, 862(1). See also Stegmann v. Weeke, 279 Mo. 131, 214 S.W. 134, 135(2); Morrison v. Hess, Mo., 231 S.W. 997, 999(1); Missouri Electric Power Co. v. Smith, 348 Mo. 738, 155 S.W.2d 113, 117(1); State ex rel. Chubb v. Sartorius, 351 Mo. 1227, 175 S.W.2d 783, 785(1); Morrison v. State, Mo.App., 252 S.W.2d 97, 100(2). This seems to be consistent with the practice in federal courts. Walling v. Helmerich &. Payne, Inc., 323 U.S. 37, 43, 65 S.Ct. 11, 89 L.Ed. 29; Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 514–516, 31 S.Ct. 279, 55 L.Ed. 310. We believe a justiciable controversy is presented in the circumstances of this case. We reject the suggestion that the appeal should be dismissed as moot.

Ninety-nine per cent of the product distributed by Laclede was natural gas, all of which came from Louisiana or Texas. Natural gas was taken from pipe lines and put directly into the distribution system or in storage. In addition to other methods, Laclede maintains an underground storage reservoir in St. Louis County capable of accommodating in excess of two billion feet of gas. Large quantities of pipe fittings, meters and other supplies and products were also purchased by Laclede from outside the State of Missouri. For the

year ending December 31, 1955, Laclede's gross revenue was in excess of $41,000,000. The defendants contend, and properly so, that Laclede Gas Company was engaged in interstate commerce and that its labor activities are subject to the Labor Management Relations Act, 1947. Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emp. of America, Division 998 v. Wisconsin Employment Relations Board, 340 U.S. 383, 391, 71 S.Ct. 359, 95 L.Ed. 364; State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75, 80(8).

The defendants' first attack upon the constitutionality of the King-Thompson Act, Ch. 295 RSMo 1949, V.A.M.S., is that it contravenes Art. I, Section 8, and Art. VI of the Constitution of the United States in that it conflicts with the National Labor Relations Act of 1935, as amended by the Labor Management Relations Act of 1947. The national labor relations laws were enacted pursuant to Section 8, Clause 3 of Art. I, which empowers Congress to regulate commerce among the several states. Art. VI, Clause 2, declares the Constitution and the laws of the United States made pursuant thereto to be the supreme Law of the Land.

■ The constitutionality of the King-Thompson Act was under attack on the same ground in the case of State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75. In the Pigg case, this court held the Act was severable, particularly those sections directly affecting the State Board of Mediation, its legal existence, powers and duties. 244 S.W.2d 79(7). The first eight sections of the King-Thompson Act, Secs. 295.010–295.080 RSMo 1949, V.A.M.S., declaring state policy, defining terms, creating the Board and defining its duties, powers and mediation

services, were held not to be in conflict with the Labor Management Relations Act, 1947, particularly in view of Secs. 202(c) and 203(b), 29 U.S.C.A. Secs. 172(c) and 173(b), which contemplate the existence of State Boards and cooperation with them. 244 S.W.2d 80(8, 9). Sections of the King-Thompson Act providing for public hearing panels, being Secs. 295.120–295.170, were held in the Pigg case not to require compulsory arbitration and not to be in conflict with the Labor Management Relations Act since both the federal and state acts "rely upon the force of public opinion to induce the parties to arrive at a voluntary agreement." 244 S.W.2d 82(10). To the extent that those sections are a necessary predicate for the additional sections not reached for decision in the Pigg case, but with which we are now concerned, we reaffirm our previous holding that those sections are not unconstitutional as being in conflict with the federal Act.

■ The facts relied upon to rebut the presumption of constitutionality of the Act must specifically appear in the record. Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185, 56 S.Ct. 159, 80 L.Ed. 138, 101 A.L.R. 853; State ex rel. Kenosha Auto Transport Corporation v. Flanigan, 349 Mo. 54, 159 S.W.2d 598, 599(2, 3). Judicial review will not be accorded constitutional questions which are not directly and necessarily involved in the particular legal situation presented on appeal. Juengel v. City of Glendale, Mo., 161 S.W.2d 408, 409(2); Kansas City, Mo. v. Williams, 8 Cir., 205 F.2d 47, 51(3), certiorari denied 346 U.S. 826, 74 S.Ct. 45, 98 L.Ed. 351.[1]

The essential facts in this case are that the governor, after investigation, proclaimed that the public interest, health and welfare were jeopardized as a result of

1. The wisdom of our not passing on such questions until they are squarely before us is well stated in West v. Spencer, 238 Mo. 65, 141 S.W. 586, 588(2), as follows: "This rule has a tendency to exclude obiter; it points the distinction between a legal treatise on a general head of the law and a judicial opinion on a concrete case, and it saves trouble to those judges who come after us and are called to decide the question as vital and turning in some appeal."

the interruption of gas service caused by a strike of Laclede employees; executive orders were issued, the property of the utility was seized; and, when the employees failed to return to work, the state sought and obtained an injunction. The parts of the Act directly involved are Section 295.180, relating to the power of seizure, and subparagraphs (1) and (6) of Section 295.200 RSMo, V.A.M.S., making unlawful a strike or concerted refusal to work after seizure and giving the state courts power to enforce the provisions of the Act by injunction or other means. Under established principles, we will restrict our consideration to those sections directly involved.

■ The dominant purpose of the King-Thompson Act is the protection of the welfare and health of the people when threatened by the interruption of services of utilities operating under governmental franchise or permit or under governmental ownership and control. It is an exercise of the police powers of the state.[2] Its provisions are directed against both the utility and its employees for the purpose of protecting the patrons and the public generally. While it makes mediation services and public hearing panels available, it does not force these services upon the parties. This is consistent with the policy of the Labor Management Relations Act, 1947. The Act does not purport to be a complete set of labor relation laws.

Section 295.180 authorizes the governor to take possession of the utility property for the use and operation by the state of Missouri only when the parties to the labor dispute "engage in any strike, work stoppage or lockout which, in the opinion of the governor, will result in failure to continue the operation of the public utility, and threatens the public interest, health and welfare."

The State of Missouri has regulated the relations between public utilities and their patrons as far back as 1913 when the Public Service Commission was established. See Laws of Missouri 1913, p. 602, now Ch. 386, RSMo 1949, V.A.M.S. The Public Service Commission Law disclaims any intent to interfere with interstate commerce, "except in so far as the same may be permitted under the provisions of the Constitution of the United States and the acts of congress." Laws of Missouri 1913, p. 651, Sec. 138; Sec. 386.030 RSMo 1949, V.A.M.S.

■ The right of a state to regulate and control public utilities operating within its borders is inherent and is referable to the police powers. Statutes with respect thereto being remedial should be liberally construed. State ex rel. Laundry, Inc., v. Public Service Commission of Missouri, 327 Mo. 93, 34 S.W.2d 37, 42(2); Atlantic Coast Line R. Co. v. North Carolina Corp. Comm., 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933; Louisville & N. R. Co. v. Railroad Commission of Tennessee, C.C., 19 F. 679; 73 C.J.S. Public Utilities § 11, p. 1006; 43 Am.Jur. 577, Public Utilities and Service § 10. Section 386.610 of our statutes provides that the Public Service Commission Law "shall be liberally construed with a view to the public welfare, efficient facilities and substantial justice *between patrons and public utilities.*" (Emphasis supplied.)

Chapter 386 of the statutes deals generally with the public service commission, its power and duties and procedure before it. Chapter 393 deals specifically with gas, electric, water and heating corpora-

---

2. Section 295.010, declaring the state policy is as follows: "It is hereby declared to be the policy of the state that heat, light, power, sanitation, transportation, communication, and water are life essentials of the people; that the possibility of labor strike in utilities operating under governmental franchise or permit or un-

der governmental ownership and control is a threat to the welfare and health of the people; that utilities so operating are clothed with public interest, and the state's regulation of the labor relations affecting such public utilities is necessary in the public interest. (L.1947 V. I p. 358 § 1)."

tions. Sec. 393.130 provides that every such utility, including a gas company, is required by law to furnish and provide "such service instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable." Laws of Missouri 1913, p. 602.

It is quite clear that the "patrons" of Laclede Gas Company were not furnished with "safe and adequate" service after the strike began. The strike had been in progress for five days before the governor exercised his emergency powers and it was four days later before the state filed suit. The evidence demonstrates conclusively that the public health, safety and interest was jeopardized and that the governor had reasonable cause to take action.

The evidence showed that Laclede had approximately 364,000 customers, including domestic, industrial and commercial users. It was the only utility distributing gas in the area. Residential customers used gas for cooking, water heating, refrigeration and space heating. Practically all of the hospitals in the St. Louis area used gas for sterilization, hot water heating, cooking and space heating. Doctors and dentists in the area were also furnished with gas for their office purposes. Large housing projects were also among the company's customers.

During the first ten days of the strike, Laclede received in excess of 13,000 service calls concerned principally with complaints that the gas service had failed or that leaks existed in the streets. Records of typical cases involving danger to health and safety were put in evidence by the state. The normal number of complaints concerning failure of gas service for such a period was about 100. There was testimony that "practically all the areas in our county system" had been denied gas service due apparently to the closing of shut-off valves by unauthorized persons. Areas within the city of St. Louis were without gas largely due to water being injected into the gas mains. Shut-off valves were locked

in boxes which could be opened only by a special type of key. Certain employees had these keys prior to the strike and there was no way of telling if all of them had been turned in. Some members of fire departments throughout the city and county also had keys to these boxes. Instances were discovered by the police where water was injected into the gas mains. In one case, the hose from a water faucet was still connected and water was running into the gas pipe when the police arrived. Water in the gas system may shut off a customer's gas temporarily in traveling through the pipes to a low point in the system; and, after it has passed, the gas may come back on and escape through an open outlet, thereby creating a dangerous situation. Restoring gas service in any section requires the help of a great number of people. If the valve were merely turned on again, gas might escape through an open outlet and create an explosive or otherwise dangerous situation. It is necessary to shut off the gas at every meter, turn the gas back into the system, then turn on the gas for each customer and light the pilots. During the strike the company did not have sufficient employees to restore service once it had been turned off.

There were also reports of gas escaping into the sewer systems and causing gas fires which had to be extinguished. At one station, wires carrying electric current used for power were disconnected by the unscrewing and removing of three bolts. In trying to discover the trouble, the man in charge of the plant came in contact with the wires and was severely burned. If the electric connection had not been restored in time, the seal of the gas tank would have been broken and the gas in the holder would have escaped. There was also evidence of tampering with the telemetric controls, which are instruments designed to keep the gas pressure at the proper amount in various sections of the distribution system. This created a danger in that gas lines might be ruptured by excessive pressure and flames on burning

appliances might be dangerously increased. Arrangements were made with city and county police to protect the places where these telemetric controls were located, but the police could not furnish twenty-four-hour protection. The company also received numerous reports of escaping gas. Since natural gas has practically no odor, it was the practice of Laclede and other companies to add an odorant for safety purposes so that leaks could be detected more readily. This odorant, a liquid, was normally available to some of the employees. During the strike a bottle of this odorant was thrown through a window of the Forest Park office of the company, and other quantities of it were deposited at various places in the service area to give the impression that there were leaks where none existed.

When the strike began, the unions advertised in the newspapers that they were setting up crews to take care of emergency work and listed telephone numbers for the public to call. The defendants' evidence was that these crews responded to approximately 150 calls.

While the evidence is not sufficient to show that the defendants were responsible for these acts of sabotage which helped bring on the emergency, it was sufficient to prove that there was a serious and alarming interruption of utility service and the public interest, health and safety were jeopardized. This was the setting in which the governor issued his proclamation and executive orders.

Daniel C. Rogers, Chairman of the State Board of Mediation, told the union repre-

sentatives that by their strike they had caused the service of a public utility to be discontinued and advised them that under the Public Service Commission Law, he felt that "they, as well as the company, were obliged to render continuous and safe service to the public." However, the employees did not resume their duties until the trial court rendered its judgment and decree.

"Employees of a public service corporation assume upon entering the service an implied obligation to perform their duties in such a manner as will enable the corporation to discharge its obligations to the public." 35 Am.Jur. 514, Master and Servant, Sec. 82. See also Wilson v. New, 243 U.S. 332, 353, 37 S.Ct. 298, 61 L.Ed. 755.

A utility in its relation to the state and the people it serves cannot be considered wholly separate and apart from its employees for without them the utility cannot function and render safe and adequate service.[3] The Public Service Commission law recognizes this and imposes penalties on employees as well as on utilities for their wrongful acts.

Section 386.570 imposes a penalty upon any corporation, person or public utility which violates or fails to comply with any provision of the constitution or any law of the state or any order of the commission. In like manner, section 386.580 makes it a misdemeanor for every officer, agent or employee of a public utility who violates or fails to comply with any provision of the constitution or of the laws of this state or any order of the commission.[4] This al-

---

3. Section 10, Art. VII of the Labor Agreement of Local 8-6, dealing with work under adverse weather conditions, provides, inter alia, p. 43: "During inclement weather Leak Trucks shall do work of emergency nature only. (Emergency work includes turning on of service and answering of all leaks reported by the public.)" This contract, put in evidence by the defendants, expired June 30, 1956, but the portion quoted indicates a rec-

ognition of public obligation by the employees as well as by the utility.

4. "386.580. Employee of public utility guilty of misdemeanor, when.—Every officer, agent or employee of any corporation or public utility, who violates or fails to comply with, or who procures, aids or abets any violation by any corporation, person or public utility of any provision of the constitution of this state or of this or any other law, or who fails to obey,

so has been the law of Missouri since 1913, presumably a valid enactment under the police powers of the state.

 A local public utility occupies a favored position in that it is free from competition and has other privileges such as the right of eminent domain. These advantages inure to the benefit of the utility employees in the form of greater continuity and security of jobs and compensation. The demand for utility services is constant. Compensation of employees is an operating cost of the utility and the rate must be sufficient for the payment of such expenses. 73 C.J.S. Public Utilities § 25, note 15, p. 1040. The employees' duties are owed to the public though rendered through the utility. So long as the status of employee continues, the duty remains. Regulation by the state is necessary because utility service is not an individual, but a community problem. The state's representation of the public would be deficient if it did not have some right to control the conduct of employees through which the utility operates.

 A strike or lockout which jeopardizes the public health, safety or interest is not a protected activity under the Labor Management Relations Act, 1947. Sec. 1(b) of the Act, 29 U.S.C.A. Sec. 141(b) provides: "Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, *and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety or interest.*" 61 Stat. 136. (Italics added.) This congressional declaration clearly indicates a purpose to subordinate such "acts and practices" to the public health, safety and interest. By use of the term "under law" state laws must have been intended as well as federal laws because historically and traditionally the state governments have been vested with the protection of the public health, safety and interest under their general police powers.

Consistent with the subordination of labor relation acts and practices which jeopardize the public interest is the 1947 amendment which makes it clear that Congress did not intend to remove any existing "limitations or qualifications" on the right to strike.[5] Sec. 13 as amended; 29 U.S. C.A. Sec. 163. The United States Supreme Court has recognized that violations of local laws enacted for the preservation of property rights and personal safety are without the protection of the federal Act. National Labor Relations Board v. Fan-

observe or comply with any order, decision, decree, rule, direction, demand or requirement, or any part or provision thereof, of the commission, or who procures, aids or abets any corporation, person or public utility in their or its failure to obey, observe and comply with any such order, decision, decree, rule, direction, demand or requirement, or any part or provision thereof, * * * is guilty of a misdemeanor * * *." Laws of Missouri 1913, p. 649.

5. The National Labor Relations Board, in Marshall Car Wheel and Foundry Co., 107 N.L.R.B. 314, 315, recognized that there are employments in which the right to strike is subordinated by the nature of the employee's duties, stating: "In cases involving supervisory and plant-protection employees, the Board has recognized the validity of the general principle that the right of certain classes of employees to engage in concerted activity is limited by the duty to take reasonable precautions to protect the employer's physical plant from such imminent damage as forseeably would result from their sudden cessation of work. We are of the opinion that this duty extends as well to ordinary rank-and-file employees whose work tasks are such as to involve responsibility for the property which might be damaged. Employees who strike in breach of such obligation engage in unprotected activity for which they may be discharged or subjected to other forms of discipline affecting their employment conditions."

steel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, a "sit-down" strike; International Union U. A. W. A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U.S. 245, 258–265, 69 S.Ct. 516, 93 L.Ed. 651, intermittent work stoppages; Allen-Bradley Local No. 1111, United Electrical Radio and Machine Workers of America v. Wisconsin Employment Relations Board, 315 U.S. 740, 748–749, 62 S.Ct. 820, 86 L.Ed. 1154 and United Auto, Aircraft and Agr. Implement Workers of America v. Wisconsin Employment Relations Board, 351 U.S. 266, 274–275, 76 S.Ct. 794, 100 L.Ed. 1162, mass picketing and violence against persons and property. This is consistent with Congressional intent as expressed in other Acts where the exercise of the police power by the local government is particularly suitable. For instance, the Natural Gas Act, 52 Stat. 821, expressly provides that it shall not apply to "local distribution of natural gas or to the facilities used for such distribution." 15 U.S.C.A. Sec. 717(b). This Act was passed June 21, 1938, three years after the original National Labor Relations Act. Congress would hardly expect the state to regulate and control the local distribution of natural gas and the facilities therefor without the governmental powers necessary to make its laws and orders with respect thereto effective.

There are also federal laws which have the effect of limiting and qualifying the right to strike. In Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246, seamen of a ship whose home port was Philadelphia struck and refused to obey orders while in port at Houston. The discharge of the seamen was held to be justified because the strike was in violation of the federal mutiny laws. The national emergency provisions of the labor relations Act, 29 U.S.C.A. Sec. 176–180, have limited and qualified the right to strike and there is no question but that Congress could make unlawful and prohibit entirely strikes that jeopardize the national health, safety and interest.

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 588, 72 S.Ct. 863, 96 L.Ed. 1153.

An absence of violence traceable to the defendants does not render this a "peaceful" strike. In Senn v. Tile Layers Protective Union, 301 U.S. 468, 479, 57 S.Ct. 857, 862, 81 L.Ed. 1229, the court stated: "The statute provides that the picketing must be peaceful; and that term as used implies not only absence of violence, but absence of any unlawful act. It precludes the intimidation of customers. It precludes any form of physical obstruction or interference with the plaintiff's business." A strike such as this operates chiefly against the public. The utility loses no business because there is nowhere for the patrons to turn for service. The inevitable result of such a strike is to coerce and intimidate the customers contrary to laws made for their protection.

Both the utility and its employees failed in their duty to furnish the public with a continuous, safe and adequate supply of gas. This is in violation of the laws of Missouri and the orders of the Public Service Commission implicit in the approval of the corporate charter and the grant of the utility's franchise and permit. Such violation is made a misdemeanor by our statutes, Secs. 386.570 and 386.580. Further, our conspiracy statute, Sec. 556.120, provides: "If two or more persons shall agree, conspire, combine or confederate: First, to commit any offence; * * * or, sixth, to commit any act injurious to the public health or public morals, * * * shall be deemed guilty of a misdemeanor." The failure of the parties to agree upon a contract and the resultant strike does not excuse the violations. Such a strike if long continued would likely result in proceedings to suspend or revoke the utility's franchise or permit for violation of obligations provided by law.

The appellants contend this case is ruled by Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emp. of America, Division

998 v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364, but we do not think so. The statutes involved in the two cases are substantially different. One of the main differences is that the Wisconsin Act provided for compulsory arbitration while the King-Thompson Act does not. The utility employees are not required to accept mediation services or the findings of the hearing panel under the Missouri Act. Voluntary agreements through collective bargaining are not abolished. The only limitation upon an employees' strike or a company's lock-out is if the public interest is endangered. The Wisconsin Act provided for a ban on strikes and compulsory arbitration when an impasse was reached in negotiations. The Missouri Act, on the other hand, does not render a strike unlawful until the governor has determined that the public health, safety and interest is threatened and had seized the property "for the use and operation by the state of Missouri in the public interest." Section 295.180. The King-Thompson Act is strictly emergency legislation and is not a comprehensive code for the settlement of labor disputes in utilities as the Wisconsin Act appeared to be. Emergency legislation is justified under the police powers. 16 C.J.S.Constitutional Law § 198, pp. 972–973. The purpose of seizure is the preservation of community life as encouraged and fostered by the state. The purpose of the Act is to protect its citizens against disaster. As previously indicated, we deem the strike in the circumstances in this case to be unlawful and, therefore, not a peaceful strike as the term is used in Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emp. of America, Division 998 v. Wisconsin Employment Relations Board.

The King-Thompson Act operates in the field of police powers and deals specifically with the relation between a utility including its employees, on the one hand, and the "patrons" and citizens of the community, on the other. The Taft-Hartley Act deals with interstate commerce and more particularly with the relations between employ-

ers and their employees. The dominant purposes of the two Acts are different; if there is any overlapping, it is incidental and not substantial. Only undue and discriminatory burdens on interstate commerce are forbidden. Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233, 35 A.L.R.2d 335, rehearing denied 342 U.S. 843, 72 S.Ct. 21, 96 L.Ed. 637.

■ The exercise of the state police power is superseded only where repugnance or conflict with a federal act is so direct and positive that the two acts cannot be reconciled. United Const. Workers, Affiliated with United Mine Workers of America v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; Breard v. City of Alexandria, supra. As stated by Mr. Chief Justice Hughes in Kelly v. State of Washington, 302 U.S. 1, 10, 58 S.Ct. 87, 92, 82 L.Ed. 3: "The principle is thoroughly established that the exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'"

■ A growing number of decisions of the United States Supreme Court indicates a considerable area where state activity and regulation is permitted. Among the more recent cases are: International Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030, and International Association of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018. Russell recovered damages for loss of earnings and malicious interference with his employment suffered when pickets prevented his entering his place of work. Gonzales, wrongfully expelled from his union, obtained a decree of restoration to membership and a money judgment. In each case a state court judgment was affirmed although the matters appeared to be partially within the jurisdiction of the National Labor Relations

Board.[6] Police powers of the state and their exercise as opposed to federal laws were involved in Allen-Bradley Local No. 1111, United Electrical Radio and Machine Workers of America v. Wisconsin Employment Relations Board, 315 U.S. 740, 749, 62 S.Ct. 820, 826, 86 L.Ed. 1154, wherein the Court stated that it would "not lightly infer that Congress by the mere passage of a federal Act has impaired the traditional sovereignty of the several States" in regard to "such traditionally local matters as public safety and order and the use of streets and highways." The King-Thompson Act is predominately an extension of the regulation and control of public utilities in the public interest and as such is the exercise of "historical powers" of the state. So construed Sections 295.180 and 295.200, subd. 1 present no direct and irreconcilable conflict with the federal Act even without the aid of the subordination provisions of 29 U.S.C.A. Sec. 141. The Sections are therefore not unconstitutional.

 Section 295.200, subd. 6 authorizes the courts in Missouri "to enforce by injunction or other legal or equitable remedies any provision of this chapter or any rule or regulation prescribed by the governor hereunder." The state has always been deemed to have the power to compel a public utility company to furnish service to the inhabitants of the territory it has undertaken to serve. State ex rel. Ozark Power & Water Co. v. Public Service Commission of Missouri, 287 Mo. 522, 229 S.W. 782, 785(2); New York & Queens Gas Co.

v. McCall, 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337; 73 C.J.S.Public Utilities § 8a, p. 1002.

43 Am.Jur. 595, Public Utilities and Service, § 33 states: "A common use of the remedy of injunction against public utilities is to compel them to perform their obligations to the public, as, for example, the obligation to furnish service or supply a commodity." Among the cases cited in support of this statement is North Carolina Public Service Co. v. Southern Power Co., 4 Cir., 282 F. 837, 33 A.L.R. 626, writ of certiorari dismissed 263 U.S. 508, 44 S.Ct. 164, 68 L.Ed. 413. See also 15 A.L.R.2d 257–264.

Our general statute, Section 386.360, expressly providing for such relief in the public interest states that: "Whenever the commission shall be of the opinion that a * * * gas corporation, * * * is failing or omitting or about to fail or omit to do anything required of it by law or by order or decision of the commission, or is doing anything or about to do anything or permitting anything or about to permit anything to be done, contrary to or in violation of law or of any order or decision of the commission, it shall direct the general counsel to the commission to commence an action * * * for the purpose of having such violations or threatened violations stopped and prevented either by mandamus or injunctions."

Section 295.210 is a savings clause similar to that contained in the Labor Management

6. See also: Allen-Bradley Local No. 1111, United Electrical Radio and Machine Workers of America v. Wisconsin Employment Relations Board, 315 U.S. 740, 748–751, 62 S.Ct. 820; Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691. International Union, U. A. W. A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651; Garner v. Teamsters, Chauffeurs and Helpers Local No. 776 Union, 346 U.S. 485, 488, 74 S.Ct. 161, 98 L.Ed. 228; United Construction Workers, Affiliated with United Mine Workers of America v. Laburnum Construction Corp., 347 U.S. 656, 74 S.Ct. 833; Adams Dairy, Inc. v. Burke, Mo., 293 S.W.2d 281, certiorari denied 352 U.S. 969, 77 S.Ct. 360, 1 L.Ed.2d 323; United Auto, Aircraft and Agricultural Implement Workers of America v. Wisconsin Employment Relations Board, 351 U.S. 266, 274, 76 S.Ct. 794, 100 L.Ed. 1162; Amalgamated Clothing Workers of America v. Richmond Bros., 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600; Empire Storage and Ice Company v. Giboney, 357 Mo. 671, 210 S.W.2d 55, affirmed 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834.

Relations Act, 29 U.S.C.A. Section 143. It provides: "No employee shall be required to render labor or service without his consent; nor shall anything in this chapter be construed to make the quitting of his labor or services by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service without his consent." It follows that section 295.200, subd. 6 is not in conflict with the federal Act and is, therefore, not unconstitutional.

The sections which we have considered are severable from and may stand independently of the remainder of the Act. Although the defendants argue strenuously to the contrary, no case is made in this record for determination of the constitutionality of section 295.090, pertaining to a written labor agreement of a minimum duration and section 295.200, subparagraphs 2, 3, 4 and 5, relating to monetary penalties and loss of seniority. We, therefore, refrain from expressing any opinion with reference thereto. Wilson v. New, 243 U. S. 332, 354, 37 S.Ct. 298, 61 L.Ed. 755; Lolordo v. Lacy, 337 Mo. 1097, 88 S.W.2d 353, 360(19); Beets v. Tyler, 365 Mo. 895, 290 S.W.2d 76, 82(16); Logsdon v. Duncan, Mo., 293 S.W.2d 944, 946(1); State ex rel. State Board of Mediation v. Pigg, supra.

■ The appellants next charge that the King-Thompson Act is in violation of Art. I, § 29, of the Constitution of Missouri, V.A.M.S., because the right to bargain collectively includes the right to strike. Section 29 provides: "That employees shall have the right to organize and to bargain collectively through representatives of their own choosing." This is to the same effect as § 7 of the amended National Labor Relations Act, 29 U.S.C.A. § 157, yet limitations on the right to strike are recognized under the federal law. The King-Thompson Act does not abolish the right of utility employees to strike, but only subordinates the right to the public interest. This is an exercise of the police power of the State

which § 29 does not impair. See City of Springfield v. Clouse, 356 Mo. 1239, 206 S.W.2d 539, 542, 544, and Glidewell v. Hughey, Mo., 314 S.W.2d 749. We find no valid distinction which would prefer this over other constitutional guarantees of personal liberties which have been held to be subordinate to the police powers. Breard v. Alexandria, 341 U.S. 622, 642, 71 S.Ct. 920, 95 L.Ed. 1233; Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166–167, 64 S.Ct. 438, 88 L.Ed. 645.

■ Next appellants contend that Sec. 295.180, providing for seizure, is an unlawful delegation of legislative powers violative of Art. II, Sec. 1, of the Constitution of Missouri, 1945, in that it does not provide sufficient standards and guides for "carrying out the seizure provisions of the Act." The alleged deficiencies of the Act in this regard are not pointed out more specifically. Sec. 295.180 sets out in considerable detail the circumstances under which the governor may take possession of utility property. Sec. 295.200, subd. 1 makes a strike or concerted refusal to work thereafter unlawful and Sec. 295.200, subd. 6 vests the courts with jurisdiction to enforce the Act or any of the governor's rules or regulations. We do not think the Act "fails to prescribe with reasonable clarity the limits of the power delegated," 42 Am. Jur. 341, Public Administrative Law, Sec. 44, or that it fails to state the purpose "with sufficient exactness to enable those affected to understand these limits." United States v. Rock Royal Co-op, Inc., 307 U.S. 533, 59 S.Ct. 993, 1013, 83 L.Ed. 1446. When the legislature has described the purpose or rule, matters of detail in administering the act may be left to the executive even though the exercise of discretion is involved. Spitcaufsky v. Hatten, 353 Mo. 94, 182 S.W.2d 86, 109(60), 160 A.L.R. 990; State ex inf. Crain ex rel. Peebles v. Moore, 339 Mo. 492, 99 S.W.2d 17, 21(6). It is not necessary that statutes prescribe a rule of action where they deal with situations which require the vesting of discretion in a public officer such as

where the discretion relates to a police regulation and is necessary to protect the public health, safety and welfare. Ex parte Williams, 345 Mo. 1121, 139 S.W.2d 485, 490(10); Kalbfell v. City of St. Louis, 357 Mo. 986, 211 S.W.2d 911, 915(3). See also 16 C.J.S. Constitutional Law § 138, p. 575 and 42 Am.Jur. 337, Public Administrative Law, Sec. 43. The assignment is denied.

■ Next the appellants attack Sec. 295.200, subd. 1 on the ground that it violates Secs. 2, 8, 9 and 10, art. 1, of the Constitution of Missouri, and the First, Thirteenth and Fourteenth Amendments of the Constitution of the United States. Sec. 295.200, subd. 1 provides: "It shall be unlawful for any person, employee, or representative as defined in this chapter to call, incite, support or participate in any strike or concerted refusal to work for any utility or for the state after any plant, equipment or facility has been taken over by the state under this chapter, as means of enforcing any demands against the utility or against the state."

First the appellants claim that the statute is so vague and indefinite that it violates rights of free speech, peaceable assembly, due process and other constitutional guarantees. They say the statutory language is susceptible of different meanings and cite cases involving criminal statutes, which generally hold that due process requires the crime and its elements to be so clearly expressed that an ordinary person may know the lawful course. This is not a criminal statute, but in any event, we do not think the statute is fatally vague or indefinite. As stated in United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877, the constitution does not require impossible standards and: "The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more."

Further the defendants contend that Sec. 295.200, subd. 1 is an "outright denial of the right of free speech" guaranteed in the First and Fourteenth Amendments to the United States Constitution and Sec. 8, Art. I of the Missouri Constitution and that the statute denies their rights to peaceably assemble for their common good, pursuant to Sec. 9, Art. I of the Constitution of Missouri. In support of these contentions, the defendants cite Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L. Ed. 1093, holding invalid a statute forbidding picketing; Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430, involving a state statute requiring labor organizers to register before soliciting union memberships; Marx & Haas Jeans Clothing Co. v. Watson, 168 Mo. 133, 67 S.W. 391, 56 L.R.A. 951, seeking to enjoin distribution of a circular regarding the plaintiff's labor practices; and Ex parte Hunn, 357 Mo. 256, 207 S.W.2d 468, holding invalid the Madison Act, a state statute.

The cases cited by the defendants recognize that these constitutionally guaranteed rights are subject to regulation in the public interest. The circumstances under which this may be done and to what extent is well-stated in an opinion by the late Chief Justice Vanderbilt of the Supreme Court of New Jersey in a case involving an attack upon a similar New Jersey statute, State, by Van Riper v. Traffic Telephone Workers Federation, 2 N.J. 335, 66 A.2d 616, 622, 99 L.R.A.2d 854, as follows: "It must be recognized that the statutes in question inevitably impinge upon the unfettered exercise of some of the constitutional guarantees asserted by the defendant union, but only out of deference, however, to the paramount significance of other public rights. That, as we have shown, is not an uncommon occurrence in the field of constitutional law. The immediate question is whether or not such restrictions on the absolute application of any constitutional guarantees come within the area delimited in the decisions of the Supreme Court of the United States as the ultimate arbiter of the meaning of the

Federal Constitution as justifying such restrictions. The tests that the United States Supreme Court has laid down in this field, and particularly where freedom of speech, freedom of the press, and freedom of assembly are involved, are that such restraints are justifiable only 'to prevent grave and immediate danger to interests which the state may lawfully protect' and any such restraints must be reasonable."

▮ Defendants make no showing that the statute interferes with their right of assemblage or freedom of speech as such. Nor does it prohibit picketing except as it may be an adjunct of the strike or concerted refusal to work. Moreover, picketing is not an unqualified right, but is also subject to the police power. See Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 503–504, 69 S.Ct. 684, 93 L.Ed. 834; Building Service Employees International Union, Local 262 v. Gazzam, 339 U.S. 532, 536, 70 S.Ct. 784, 94 L.Ed. 1045; and International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local 309 v. Hanke, 339 U.S. 470, 474, 70 S.Ct. 773, 94 L.Ed. 995; International Broth. of Teamsters, Local 695, A. F. L. v. Vogt, Inc., 354 U.S. 284, 77 SCt. 1166, 1 L.Ed.2d 1347, discusses the more recent cases including Thornhill and concludes, 354 U.S. 293, 77 S.Ct. 1171: "This series of cases, then, established a broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." This statute is part of emergency legislation dealing with clear and present threats to the public health and welfare. It is a reasonable regulation and not unconstitutional on the grounds stated.

▮ The defendants further say that § 295.200, subd. 1 denies utility employees and their representatives equal rights and opportunities under law, Art. I, § 2 of the Missouri Constitution, and equal protection of the laws under the Fourteenth Amendment. It is within the legislative authority to classify and deal with businesses affected with the public interest. Munn v. State of Illinois, 94 U.S. 113, 24 L.Ed. 77. The classification of utility employees and union representatives cannot be said to be lacking any adequate or reasonable basis. Whitney v. People of State of California, 274 U.S. 357, 370, 47 S.Ct. 641, 71 L.Ed. 1095; Wilson v. New, 243 U.S. 332, 349, 37 S.Ct. 298, 61 L.Ed. 755. It is unnecessary for the state legislature to cover the whole field of possible abuses. Hughes v. Superior Court of State of California, 339 U.S. 460, 468, 70 S.Ct. 718, 94 L.Ed. 985.

▮ Finally, the defendants say that § 295.200, subd. 1 imposes a form of compulsory service or involuntary servitude in violation of Amendment Thirteen of the Constitution of the United States. Section 295.210 is a saving provision similar to the one in the Labor Management Relations Act, 1947, 29 U.S.C.A. § 143. It provides in substance that no employee shall be required to render labor or service without his consent and that the Act shall not be construed so as to make the quitting of his job by an individual employee an illegal act. The defendants' interpretation of the § 295.200, subd. 1 is strained and unwarranted. It loses sight of the fact that the section under attack is directed against a strike or concerted refusal to work and has nothing to do with one or more quitting work of their own volition. The section does not have the purpose or effect of imposing involuntary servitude in violation of the Thirteenth Amendment. International Union, U. A. W. A. F. of L., Local 232 v. Wisconsin Employment Relations Board, 336 U.S. 245, 251, 69 S.Ct. 516, 93 L.Ed. 651.

▮ In its amended judgment and decree entered August 17, 1956, the trial court found and declared that "Chapter 295, R.S.Mo., 1949 [V.A.M.S.] and all portions thereof are valid, enforceable, constitutional, and not in violation or deroga-

tion of the *Constitution* of the United States or of the Constitution of the State of Missouri." We have limited our inquiry and determination to §§ 295.010–295.080, 295.120–295.170, 295.180, 295.200, subd. 1 and 295.200, subd. 6. With respect to these sections, we have considered and denied all of defendants' claims of unconstitutionality.

As so limited and modified the judgment is affirmed.

All concur.